# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JESSICA TRESSLER, | : | CIVIL NO: 1:24-CV-00456 |
| | : | |
| Plaintiff | : | |
| | : | (Magistrate Judge Schwab) |
| v. | : | |
| | : | |
| CENTRE COUNTY, *et al.*, | : | |
| | : | |
| Defendants | : | |

## MEMORANDUM OPINION

## I.  Introduction.

The plaintiff, Jessica Tressler, contends that because she did not receive appropriate care for her serious medical needs while detained at a county prison, she was injured and needed heart-valve replacement surgery.  She has sued numerous individuals and entities.  Currently before the court is a motion to dismiss the complaint filed by some of the defendants.  For the reasons set forth below, we will grant in part and deny in part that motion to dismiss.  We will also give Tressler leave to file an amended complaint.

## II.  Background and Procedural History.

Tressler began this action by filing a complaint on March 15, 2024. *See Doc. 1.*  There are three groups of defendants—the named County defendants, the

named PrimeCare defendants, and the John Doe defendants.  The named County

defendants are Centre County, the Centre County Correctional Facility ("CCCF"),

and the following officers and officials of the CCCF: Supervisor Glenn Irwin,

Supervisor Christopher Schell, Counselor Henry Napolean, Corrections Officer

Medford, Corrections Officer Vangorder, Corrections Officer Rupert, and

Corrections Officer Quigley.  The named PrimeCare defendants are PrimeCare

Medical, Inc. ("PrimeCare") and the following medical providers and employees

of PrimeCare: Crystal Reams, Brenda Peters, Cassandra Nichols, Alesha Weaver,

Desiree Sheran, Deanna Brisco, Kelsey Schmidt, Nathan Figart, Stephanie Struble,

Jade Lose, and Rita Camacho.  The John Doe defendants are listed as John Doe

Corrections Officers, John Doe Medical Director, and John Doe Medical Provider.

The John Doe defendants have not yet been identified and served.  The

named PrimeCare defendants have filed an answer to the complaint. *See doc. 12*.

And the named County defendants have filed a motion to dismiss the complaint.

*See doc. 13*.[1]  Because the motion to dismiss filed by the named County defendants

is what is currently before the court, we summarize the allegations in the complaint

with respect to the named County defendants.

---

[1] All the named parties have consented to proceed before a magistrate judge
pursuant to 28 U.S.C. § 636(c). *See doc. 11*.

From April 1, 2022, to April 18, 2022, Tressler was an inmate at the CCCF, where she was held for a violation of probation. *Doc. 1* ¶ 15. While at the CCCF, Tressler was not properly treated for opiate withdrawal and a urinary tract infection. *Id*. ¶ 16. The individual defendants labeled her a drug-seeking faker, and she was denied medical care and refused medication because she could not ambulate. *Id*. ¶ 19. Tressler suffered a gastrointestinal bleed, sepsis, and an electrolyte disturbance complicated by dehydration. *Id*. ¶ 16. Ultimately, she had to have heart-valve-replacement surgery. *Id*. If Tressler had received proper antibiotic treatment for bacteremic sepsis, she would have avoided valve damage. *Id*.

More specifically, Tressler alleges that on April 1, 2022, a PrimeCare defendant responded to her complaint of severe back pain. *Id*. ¶ 20a.[2] This medical provider noted that Tressler's blood pressure was severely elevated and that Tressler had pain in her left flank area, but she did not provide Tressler with any medical care. *Id*. Later that same day, another medical provider came to Tressler's cell. *Id*. ¶ 20b. Tressler begged for help, but this medical provider labeled her (in

---

[2] Tressler provides the name of this medical provider as well as the names of numerous other medical providers allegedly involved in the events. But we are currently concerned only with the claims against the named County defendants, not the named PrimeCare defendants. Thus, although Tressler names the medical providers, to avoid confusion from so many different names and to highlight when a County defendant is involved, for present purposes we refer to the medical providers simply as medical providers rather than by their names.

her chart) as a drug-seeking faker, ignored her complaints, and denied her medical care. *Id.* Later still on April 1, 2022, Tressler complained of pain at or near her kidneys, said she believed she had a kidney infection, and asked for treatment. *Id.* ¶ 20c. But the medical provider believed Tressler was drug seeking and feigning pain, and so, she denied Tressler medical care. *Id.* Two other medical providers prescribed testing for Tressler, but they did not follow up and did not give Tressler medical treatment. *Id.* ¶ 20d.

On April 2, 2022, another medical provider and Corrections Officer Medford appeared at Tressler's cell. *Id.* ¶ 20e. Tressler complained of flank pain, and the medical provider and Officer Medford observed her urinate and checked her prescriptions. *Id.* Tressler was not provided any additional medical care. *Id.* Later that day, one of the medical providers from the previous day returned to Tressler's cell, discussed Tressler's pain level, belittled Tressler, and told her that she would not get any additional medication for pain. *Id.* ¶ 20f.

On April 3, 2022, Tressler was denied all medical care. *Id.* ¶ 20g.

On April 4, 2022, a medical provider acknowledged that Tressler had a urinary tract infection, but she did nothing to follow up and did not provide Tressler with any additional medical care or monitoring. *Id.* ¶ 20h.

On April 5, 2022, a medical provider examined Tressler and performed a physical, but he did not give Tressler any medical care. *Id.* ¶20i. He also observed

blood in Tressler's urine and noted her kidney pain, but he did not give her additional medical treatment. *Id.* Also on April 5, 2022, another medical provider approved an order to give Tressler anti-inflammatory medicine, but she did not personally examine Tressler. *Id.* ¶20j.

The next day, although a medical provider came to Tressler's cell, she refused to provide medical treatment. *Id.* ¶20k.[3]

On April 7, 2022, Tressler was again not provided with any medical care and was not examined even though a medical provider reviewed her chart, which revealed that she had a urinary tract infection. *Id.* ¶ 20l.

On April 8, 2022, when a medical provider came to Tressler's cell, Tressler begged for medical care due to kidney pain. *Id.* ¶ 20m. The provider gave her a Gatorade. *Id.*

On April 9, 2002, a medical provider examined Tressler, but she did give her any medical treatment or care other than ordering Tylenol for her. *Id.* ¶¶ 20n, 20o.

On April 10, 2022, a medical provider reviewed Tressler's chart and indicated that her detox was complete, but she did not provide Tressler with any medical care. *Id.* ¶ 20p. Also on April 10, 2022, a medical provider and Corrections Officers Vangorder and Rupert came to Tressler's cell, and Tressler,

---

[3] The complaint merely alleges that she "refused to provide Plaintiff medical." *Doc. 1* ¶ 20k. We assume this means that the medical provider refused to provide Tressler with medical treatment.

who was lying face down on her bed and was unable to ambulate, told them that she could not feel her legs. *Id*. ¶ 20q.  The only care provided was that the medical provider offered Tressler a "muscle rub" and increased the dosage of Tylenol. *Id*. Later that same day, another medical provider and Officer Vangorder entered Tressler's cell, where they found her unconscious and used smelling salts to revive her. *Id*. ¶ 20r.  They provided limited to no medical care. *Id*.

The next day, a medical provider entered Tressler's cell, and still believing that she was faking, provided no care. *Id*. ¶ 20s.  And the medical provider scolded Tressler regarding Tressler's inability to ambulate. *Id*.

On April 12, 2022, Tressler did not receive any medial care. *Id*. ¶ 20t.

On April 13, 2022, a medical provider reviewed Tressler's chart and test results. *Id*. ¶ 20u.  Although she acknowledged Tressler's abnormal results on Tressler's chart, she did not provide any follow-up care. *Id*.

On April 14, 2022, a medical provider and Corrections Officer Quigley entered Tressler's cell, where Tressler was lying naked and was mumbling incoherently. *Id*. ¶ 20v.  Although Tressler begged to go to the hospital, the medical provider told her that she needed to ambulate and that she would feel better. *Id*.  She was not given any medical care. *Id*.  Later that same day, the medical provider returned to Tressler's cell. *Id*. ¶ 20w.  Tressler could not ambulate, and the medical provider denied her medication because she could not

retrieve the medicine from the front of the cell. *Id.* Tressler again asked to go to the hospital, but that request was denied because the medical provider believed that she was drug seeking and faking her pain. *Id.*

On April 15, 2022, a medical provider arrived at Tressler's cell and found her unclothed, listless, and mumbling. *Id.* ¶ 20x. Tressler again asked to go to the hospital, but the medical provider told her that she was drug seeking and that she needed to be completely detoxed. *Id.* After Tressler urinated on herself, she was placed in a restraint chair, moved to the public shower, and hosed off. *Id.* She was given a Gatorade, but otherwise was denied medical care. *Id.*

On April 16, 2022, Tressler was denied all medical care. *Id.* ¶ 20y.

On April 17, 2022, Tressler was unable to get out of bed, and she asked for help getting cleaned up after she defecated on herself. *Id.* ¶ 24. She was left sitting in her own feces for approximately five hours after which corrections officers and medical staff entered the cell to help her get cleaned up. *Id.* Three medical providers found Tressler lying in her own urine and feces in her cell. *Id.* ¶ 20z. They obtained an order to send her to Mount Nittany Medical Center for medical care. *Id.*

On April 18, 2022, Tressler was transported from the CCCF to the Mount Nittany Medical Center. *Id*. ¶¶ 17, 20aa, 25.[4] There, Tressler was diagnosed with internal bleeding, septic shock, a blood infection, pneumonia, and endocarditis of two heart valves. *Id*. ¶ 25. She was placed on a ventilator. *Id*. Because the doctors at the Mount Nittany Medical Center could not properly treat Tressler, she was life-flighted to Geisinger Hospital, where she underwent lifesaving medical procedures, including heart surgery. *Id*. ¶¶ 18, 26. Tressler had open heart surgery to replace two valves in her heart. *Id*. ¶ 27. And she had a second heart surgery due to an infection in her heart valve. *Id*. Tressler remained at Geisinger Hospital for approximately four months. *Id*. ¶ 26.

Tressler characterizes the conditions of her confinement at the CCCF as abhorrent and the actions of the defendants as shameful. *Id*. ¶ 20. She alleges that at the beginning of her incarceration, corrections officers and medical staff brought medication to her cell, but after several days, they stopped bringing the medication to her cell, and although she was not able to ambulate, they told her to walk to get her medication. *Id*. ¶ 21. Tressler told corrections officers and medical staff that

---

[4] Tressler alleges that after medical staff entered her cell, she was rushed to the Mount Nittany Medical Center. *Doc. 1* ¶25. And she alleges that medical staff entered her cell on April 17, 2022. *Id*. Although this suggests that she was transported to the Mount Nittany Medical Center on April 17, 2022, Tressler specifically alleges elsewhere that she was transported to the Mount Nittany Medical Center on April 18, 2022. *See id*. ¶ 17.

she could not get out of bed and needed help, but her requests for medical care were generally ignored. *Id*. Further, because she could not get out of bed to eat meals, she missed approximately 30 meals during the time she was at the CCCF. *Id*. ¶ 22. She experienced chronic diarrhea and she routinely defecated and urinated on herself. *Id*. ¶ 23. And when she began to lose consciousness, corrections officers and medical staff used smelling salts to bring her back to consciousness. *Id*. Throughout her incarceration at the CCCF, Tressler told correctional and medical staff that she was not feeling well and had trouble moving around. *Id*. ¶ 28. She was labeled a faker and drug seeker. *Id*. She avers that one particular medical provider and Corrections Officer Quigley continued to deny her care, chide her, and refused to help her in any way. *Id*. ¶ 29. She also alleges that defendant Napoleon, who was her counselor, was aware that she needed medical care, and he knew that PrimeCare short-staffed the area where she was housed. *Id*. ¶ 30. But he did not object to the lack of care that she was receiving from the corrections officer defendants and medical providers, and he did nothing to get her appropriate care. *Id*.

In April 2022, Centre County contracted with PrimeCare for PrimeCare to provide medical care to all prisoners and pretrial detainees at the CCCF. *Id*. ¶ 32. Centre County and PrimeCare were responsible for creating, implementing, and enforcing policies, practices, and procedure to ensure that prisoners and pretrial

detainees were provided with proper medical care while in custody. *Id*. ¶ 33.  But they failed to create, implement, and enforce practices and procedures to ensure that Tressler was provided proper care. *Id*. ¶ 35.  And as a result of the defendants' actions and inactions, Tressler suffered physical injury, and the delay in her care caused her to have an invasive surgical procedure. *Id*. ¶ 34.  Centre County and PrimeCare failed to ensure that medical personnel properly examined inmates with health complaints, failed to ensure that PrimeCare referrals were properly referred to outside medical professionals to provide care for inmates; and failed to provide medical personnel and staff to treat inmates with physical complaints and medical conditions at the CCCF. *Id*. ¶¶ 36–38.

According to Tressler, Centre County and PrimeCare have a long history of denying medical treatment to inmates. *Id*. ¶ 31.  And in support of that assertion, she cites four cases in this court in which such was claimed. *Id*. (citing *Bush v. PrimeCare Med., Inc.*, 1:11-cv-01738 (M.D. Pa.); *Gwilymjr v. Centre County Correctional Facility*, 3:12-cv-02605 (M.D. Pa.); *Fite v. Prime Care Medical Co.*, *Inc.*, 4:14-cv-00781 (M.D. Pa.); and *Rossman v. PrimeCare Medical, Inc.*, 4:21-cv-00703 (M.D. Pa.)).

The complaint contains five counts.  Count I contains 42 U.S.C. § 1983 claims against all the defendants based on the Fourteenth Amendment for failure to protect and denial of medical care. *Id*. ¶¶ 39–52.  Count II contains 42 U.S.C.

§ 1983 claims against defendants Irwin, Schell, and the Doe Supervisors based on the Fourteenth Amendment for supervisor liability. *Id*. ¶¶ 53–66. Count III contains 42 U.S.C. § 1983 claims against Centre County and PrimeCare for municipal liability. *Id*. ¶¶ 67–83. Count IV is a claim against PrimeCare under Pennsylvania law for vicarious liability. *Id*. ¶¶ 84–89. Count V contains claims against some of the PrimeCare defendants[5] under Pennsylvania law for medical negligence. *Id*. ¶¶ 90–96.[6]

As mentioned above, the named County defendants filed a motion to dismiss the complaint. *See doc. 13*. That motion has been fully briefed. *See docs. 14, 17, 18,*[7] *23*. For the reasons discussed below, we will grant in part and deny in part that motion to dismiss.

---

[5] Count V is brought against defendants PrimeCare, Camacho, Peters, "Desiree" (which we assume to be a reference to defendant Desiree Sheran), Nichols, Struble, Weaver, Lose, Briscoe, and Figart. *See Doc. 1* at 19 (Count V heading); *Doc. 1* ¶ 91. There is no mention in this count of defendant Reams or defendant Schmidt, who are also PrimeCare defendants.

[6] Tressler attached a certificate of merit as to defendants PrimeCare, Camacho, Peters, "Desiree" (which we assume to be a reference to defendant Desiree Sheran), Nichols, Struble, Weaver, Lose, Briscoe, and Figart. *Doc. 1* at 23.

[7] The named County defendants make numerous assertions in footnotes in their reply brief. To the extent those assertions are meant to be arguments, we note that we do not address arguments raised only in a footnote. *See United States v. Yung*, No. 19-1640, 2022 WL 2112794, at *7 (3d Cir. June 13, 2022) (concluding that appellant forfeited argument that "he "tuck[ed] it into a single footnote, without supporting authority or analysis"); *John Wyeth & Brother Ltd. v. CIGNA Int'l Corp.,* 119 F.3d 1070, 1076 n.6 (3d Cir. 1997) ("arguments raised in passing

### III.  Pleading and Fed. R. Civ. P. 12(B)(6) Standards.

In accordance with Fed. R. Civ. P. 12(b)(6), the court may dismiss a complaint for "failure to state a claim upon which relief can be granted."  When reviewing a motion to dismiss under Rule 12(b)(6), "[w]e must accept all factual allegations in the complaint as true, construe the complaint in the light favorable to the plaintiff, and ultimately determine whether plaintiff may be entitled to relief under any reasonable reading of the complaint." *Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010).  In making that determination, we "consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the [plaintiff's] claims are based upon these documents." *Id.* at 230.

"A Rule 12(b)(6) motion tests the sufficiency of the complaint against the pleading requirements of Rule 8(a)." *I.H. ex rel. D.S. v. Cumberland Valley Sch. Dist.*, 842 F. Supp. 2d 762, 769–70 (M.D. Pa. 2012).  "Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal,* 556 U.S.

---

(such as, in a footnote), but not squarely argued, are considered waived."); *Schmalz v. Sovereign Bancorp, Inc.*, 868 F. Supp. 2d 438, 457 n.14 (E.D. Pa. 2012) ("An argument made only in a footnote is not worthy of credence (other than to be rejected by footnote).").

662, 677–78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).  The statement required by

Rule 8(a)(2) must give the defendant fair notice of the nature of the plaintiff's

claim and of the grounds upon which the claim rests. *Erickson v. Pardus*, 551 U.S.

89, 93 (2007).  Detailed factual allegations are not required, but more is required

than "labels," "conclusions," or "a formulaic recitation of the elements of a cause

of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "In other

words, a complaint must do more than allege the plaintiff's entitlement to relief."

*Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).  "A complaint has

to 'show' such an entitlement with its facts." *Id.*

     In considering whether a complaint fails to state a claim upon which relief

can be granted, the court "'must accept all facts alleged in the complaint as true

and construe the complaint in the light most favorable to the nonmoving party.'"

*Krieger v. Bank of Am., N.A.*, 890 F.3d 429, 437 (3d Cir. 2018) (quoting *Flora v.

Cty. of Luzerne*, 776 F.3d 169, 175 (3d Cir. 2015)).  But a court "need not credit a

complaint's bald assertions or legal conclusions when deciding a motion to

dismiss." *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir. 1997).  A

court also need not "assume that a . . . plaintiff can prove facts that the . . . plaintiff

has not alleged." *Associated Gen. Contractors of Cal. v. California State Council

of Carpenters,* 459 U.S. 519, 526 (1983).

Following *Twombly* and *Iqbal,* a well-pleaded complaint must contain more than mere legal labels and conclusions. Rather, it must recite factual allegations sufficient to raise the plaintiff's claimed right to relief beyond the level of mere speculation. In practice, consideration of the legal sufficiency of a complaint entails a three-step analysis:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

*Santiago v. Warminster Tp.,* 629 F.3d 121, 130 (3d Cir. 2010) (footnote and citations omitted) (quoting *Iqbal,* 556 U.S. at 675, 679).

In sum, although "[w]e accept as true all factual matters [the plaintiff] alleges, . . . his complaint cannot survive unless the facts it recites are enough to state plausible grounds for relief." *Beasley v. Howard*, 14 F.4th 226, 231 (3d Cir. 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. But "[a] claim that relies just on 'conclusory statements,' or on 'threadbare recitals of the elements of a cause of action' without supporting

14

factual allegations, does not establish plausible grounds for relief." *Id*. (quoting

*Fischbein v. Olson Rsch. Grp., Inc.*, 959 F.3d 559, 561 (3d Cir. 2020)).

## IV. Discussion.

The pending motion to dismiss addresses only the claims against the named

County defendants.  Those claims are federal claims brought under 42 U.S.C.

§ 1983.  "Section 1983 imposes civil liability upon any person who, acting under

the color of state law, deprives another individual of any rights, privileges, or

immunities secured by the Constitution or laws of the United States." *Shuman v.*

*Penn Manor School Dist.,* 422 F.3d 141, 146 (3d Cir. 2005).  Section 1983 "does

not create any new substantive rights but instead provides a remedy for the

violation of a federal constitutional or statutory right." *Id.*  To establish a claim

under § 1983, the plaintiff must establish a deprivation of a federally protected

right and that this deprivation was committed by a person acting under color of

state law. *Woloszyn v. County of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005).

The named County defendants concede that they were acting under color of

state law. *See doc. 14* at 12.  Thus, the question is whether Tressler has plausibly

alleged that they deprived her of a federally protected right.

Tressler claims that the named County defendants violated her rights under

the Fourteenth Amendment.  Before we address the merits of the claims that are in

15

dispute, we note that Tressler agrees with the named County defendants that certain claims should be dismissed.  She agrees that the claims against defendants CCCF, Irwin, and Schell should be dismissed. *See doc. 17* at 13, 20.  Thus, we will dismiss those claims.  Tressler also has not objected to the named County defendants' request to strike from the complaint her demand for $5,000,000.  Thus, we will strike that demand.

We now turn to the claims that are in dispute, which are the claims against defendants Medford, Vangorder, Rupert, Quigley, and Napolean ("Individual County Defendants") and the claims against Centre County.

### A.  The Individual County Defendants.

The Individual County Defendants contend that the complaint fails to state a claim upon which relief can be granted against them and that they are entitled to qualified immunity.  In the complaint, Tressler frames her claims against the Individual County Defendants as both Fourteenth Amendment failure-to-protect claims and Fourteenth Amendment denial-of-medical-care claims. *See doc. 1* at 13 (title to Count I).  We begin with the failure-to-protect claims, and we conclude that the Individual County Defendants are entitled to qualified immunity as to those claims.  Then, we turn to the denial-of-medical-care claims, and conclude that the complaint fails to state a claim upon which relief can be granted against defendant Medford, but that it states a claim upon which relief can be granted

16

against defendants Vangorder, Rupert, Quigley, and Napoleon, and that at this stage of the proceedings, defendants Vangorder, Rupert, Quigley, and Napoleon are not entitled to qualified immunity from the denial-of-medical care claims.

### 1. Failure-to-Protect Claims.

For the reasons stated below, we conclude that the Individual County Defendants are entitled to qualified immunity from Tressler's Fourteenth Amendment failure-to-protect claims.

Despite their participation in constitutionally impermissible conduct, government officials "may nevertheless be shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hope v. Pelzer,* 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity ensures that before officers are subjected to suit, they have notice that their conduct is unlawful. *Id.* "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. 223, 231 (2009). "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Harlow,* 457 U.S. at 818–19.

The qualified immunity analysis has two prongs. *Pearson,* 555 U.S. at 232. One prong of the analysis is whether the facts that the plaintiff has alleged or shown make out a violation of a constitutional right. *Id.* The other prong of the analysis is whether the right was clearly established. *Saucier v. Katz,* 533 U.S. 194, 201 (2001).

"To determine whether a right was 'clearly established,' we conduct a two-part inquiry." *Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021). "First, we must 'define the right allegedly violated at the appropriate level of specificity.'" *Id*. (quoting *Sharp v. Johnson*, 669 F.3d 144, 159 (3d Cir. 2012)). "This requires us to frame the right 'in light of the specific context of the case, not as a broad general proposition.'" *Id*. (quoting *Saucier*, 533 U.S. at 201). "Second, we must ask whether that right was 'clearly established' at the time of its alleged violation, *i.e.*, whether the right was 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id*. (quoting *Saucier*, 533 U.S. at 202). "This is an 'objective (albeit fact-specific) question,' where '[an officer]'s subjective beliefs . . . are irrelevant.'" *Id*. (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

"To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *D.C. v. Wesby*, 583 U.S. 48, 63 (2018). In other words, "[t]he rule must be 'settled law,' which means it is dictated by

'controlling authority' or 'a robust 'consensus of cases of persuasive authority.'"
*Id*. (internal citations omitted). "It is not enough that the rule is suggested by then-existing precedent." *Id*. Rather, "[t]he precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id*.

If the law did not put the defendant on notice that his conduct would be clearly unlawful, qualified immunity is appropriate. *Bayer v. Monroe County Children & Youth Services*, 577 F.3d 186, 193 (3d Cir. 2009). "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Reichle v. Howards,* 566 U.S. 658, 664 (2012) (quoting *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011)). "This exacting standard 'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *City & Cnty. of San Francisco v. Sheehan*, 575 U.S. 600, 611 (2015) (quoting *al-Kidd*, 563 U.S. at 743).

"Defendants bear the burden of establishing qualified immunity." *White v. Dauphin Cnty.*, No. 1:22-CV-1241, 2023 WL 6392735, at *4 (M.D. Pa. Sept. 29, 2023). "Officials demonstrate they are entitled to qualified immunity only if they can show that a reasonable person in their position at the relevant time could have

believed, in light of clearly established law, that their conduct comported with recognized legal standards." *E. D. v. Sharkey*, 928 F.3d 299, 306 (3d Cir. 2019).

Here, the Individual County Defendants are entitled to qualified immunity from Tressler's failure-to-protect claims.  The United States Court of Appeals has "recognized a right to have a government actor intervene when the underlying constitutional violation involves excessive force or sexual assault of a person in custody or detention," but it has held that its "precedent does not establish, let alone clearly establish, a right to intervention in other contexts." *Thomas v. City of Harrisburg*, 88 F.4th 275, 285 (3d Cir. 2023), *cert. denied*, 2024 WL 4426554, at *1 (U.S. Oct. 7, 2024), and 2024 WL 4426555, at *1 (U.S. Oct. 7, 2024)).  The medical context is one the contexts in which the Third Circuit has held that there is no clearly established right to intervention. *Id*. at 285–86 (holding that "[b]ecause there is not a clearly established right to intervention to prevent a violation of the right to medical care, the Officers are entitled to qualified immunity as to [the plaintiff's] failure to intervene claim").

Because a Fourteenth Amendment failure-to-protect claim in the medical context is not clearly established, the Individual County Defendants are entitled to qualified immunity as to that claim.

20

### 2. Denial-of-Medical-Care Claims.

Turning to the denial-of-medical-care claims, we first address whether the complaint states a Fourteenth Amendment due process claim against the Individual County Defendants. Then, having determined that the complaint states a claim against four of the five Individual County Defendants, we address whether those defendants are entitled to qualified immunity, and we conclude that they are not.

### a. Failure to State a Claim.

Before addressing whether the allegations in the complaint state a Fourteenth Amendment denial-of-medical-care claim, we need to specify the standards for such a claim. For the reasons explained below, we conclude that although Tressler's claim is a Fourteenth Amendment due process claim, the same standards that apply to Eighth Amendment medical claims apply here. We then set forth those standards. And finally, we conclude that the complaint fails to state a claim upon which relief can be granted against defendant Medford, but that it states a claim upon which relief can be granted against defendants Vangorder, Rupert, Quigley, and Napoleon.

### i. Eighth Amendment standards apply to the denial-of-medical-care claim.

"The Third Circuit's standard for evaluating a pretrial detainee's claim of inadequate medical treatment under the Due Process Clause is not entirely clear." *Beauchamps v. Bechtold*, No. 1:22-CV-01279, 2023 WL 5017208, at *3 (M.D. Pa. Aug. 7, 2023) (Wilson, J.).  The due process rights of pretrial detainees are "at least as great" as the Eighth Amendment protections available to convicted prisoners. *City of Revere v. Massachusetts General Hospital*, 463 U.S. 239, 244 (1983).  In other words, the Eighth Amendment "establishe[s] a floor." *Hubbard*, 399 F.3d at 165–66.  But, in the context of the provision of medical care, "[t]here is an open question of 'how much more protection unconvicted prisoners should receive' under the Fourteenth Amendment" than convicted prisoners receive under the Eighth Amendment. *Mattern v. City of Sea Isle*, 657 F. App'x 134, 138 n.5 (3d Cir. 2016) (quoting *Kost v. Kozakiewicz,* 1 F.3d 176, 188 n.10 (3d Cir. 1993)).

In *Estelle v. Gamble*, the Supreme Court held that "deliberate indifference to serious medical needs of prisoners" violates the Eighth Amendment. 429 U.S. 97, 104 (1976).  The Third Circuit has previously "found no reason to apply a different standard than that set forth in *Estelle* (pertaining to prisoners' claims of inadequate medical care under the Eighth Amendment) when evaluating whether a claim for inadequate medical care by a pre-trial detainee is sufficient under the Fourteenth Amendment." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581 (3d Cir.

2003) (citing *Boring v. Kozakiewicz*, 833 F.2d 468, 472 (3d Cir. 1987)).  More

recently, in other contexts, however, both the Supreme Court and the Third Circuit

have held that the standard under the Cruel and Unusual Punishment Clause of the

Eighth Amendment, which is applicable to convicted persons, is different from the

standard under the Due Process Clause, which is applicable to pretrials detainees.

*See, e.g.*, *Kingsley v. Hendrickson*, 576 U.S. 389, 396–97, 400–01 (2015)

(contrasting the rights of convicted prisoners under the Eighth Amendment not to

be subject to cruel and unusual punishment with the rights of pretrial detainees

under the Due Process Clause not to be punished at all, and holding that to

establish an excessive force claim, unlike a convicted prisoner, who must show

that the defendant acted with the subjective intent to maliciously and sadistically

cause harm, "a pretrial detainee must show only that the force purposely or

knowingly used against him was objectively unreasonable"); *Hubbard*, 399 F.3d at

166–67 (noting that the Eighth Amendment prohibits cruel and unusual

punishment, but pretrial detainees cannot be punished at all, and reversing and

remanding in a case brought by pretrial detainees regarding conditions of

confinement because the district court improperly analyzed their claim under the

Eighth Amendment, rather than the Due Process Clause of the Fourteenth

Amendment).

Recognizing that medical claims brought by pretrial detainees are substantive due process claims, not Eighth Amendment claims, judges in this district have nevertheless generally continued to apply Eighth Amendment standards to such claims. *See, e.g.*, *Ealy v. Schell*, No. 3:24-CV-0126, 2024 WL 4291498, at *4 (M.D. Pa. Sept. 25, 2024) (Munley, J.) (applying Eighth Amendment standards to medical claim of a; *Brown v. Rivello*, No. 4:22-CV-01155, 2024 WL 4009640, at *3 (M.D. Pa. Aug. 30, 2024) (Brann, C.J.) (same); *White v. Dauphin Cnty.*, No. 1:22-CV-1241, 2024 WL 3046718, at *9 (M.D. Pa. June 18, 2024) (Conner, J.) (same); *Balliet v. Luzerne Cnty.*, No. 3:22-CV-02032, 2024 WL 2275252, at *4 (M.D. Pa. May 20, 2024) (Mehalchick, J.) (same); *Richardson v. Clark*, No. 1:22-CV-00029, 2024 WL 1258653, at *7 (M.D. Pa. Mar. 25, 2024) (Wilson, J.); *Babner v. Cumberland Cnty.*, No. 3:20-CV-02465, 2023 WL 6276673, at *1 (M.D. Pa. Sept. 26, 2023) (Saporito, [then] M.J.) (same); *Giddings v. Rogers*, No. 1:22-CV-00097, 2023 WL 2395470, at *4 (M.D. Pa. Mar. 6, 2023) (Kane, J.) (same); *Peters v. Prime Care Med. Inc.*, No. 3:22-CV-1542, 2023 WL 3396926, at *3 (M.D. Pa. May 11, 2023) (Mariani, J.) (same); *Loughney v. Corr. Care, Inc.*, No. CV 3:19-1101, 2021 WL 4447635, at *2 n.5 (M.D. Pa. Sept. 28, 2021) (Mannion, J.) (same).

Similarly, the Third Circuit has continued to rely on Eighth Amendment standards when addressing medical claims of pretrial detainees. *See e.g. Thomas*,

88 F.4th at 281 n.23 ("Because the Fourteenth Amendment affords pretrial

detainees protections at least as great as those available to inmates under the Eighth

Amendment, we will review Sherelle Thomas's claims for failure to render

medical care under the Fourteenth Amendment by applying the same standard used

to evaluate claims brought under the Eighth Amendment."); *Palakovic v. Wetzel*,

854 F.3d 209, 223, 227–233 (3d Cir. 2017) (concluding that "when a plaintiff

seeks to hold a prison official liable for failing to prevent a detainee's suicide, a

pre-trial detainee may bring a claim under the Due Process Clause of the

Fourteenth Amendment that is essentially equivalent to the claim that a prisoner

may bring under the Eighth Amendment" and addressing that claim as well as a

more general claim of deliberate indifference to a serious need for mental

healthcare under Eighth Amendment standards).

Considering the above and given that both Tressler and the Individual

County Defendants rely on Eighth Amendment standards, we will apply the Eighth

Amendment standards to Tressler's denial-of-medical-care claims against the

Individual County Defendants.

### ii.  General Eighth Amendment Standards.

"The Eighth Amendment, through its prohibition on cruel and unusual

punishment, prohibits the imposition of 'unnecessary and wanton infliction of pain

contrary to contemporary standards of decency.'" *Pearson v. Prison Health Serv.*,

850 F.3d 526, 534 (3d Cir. 2017) (quoting *Helling v. McKinney*, 509 U.S. 25, 32

(1993)).  "An inmate must rely on prison authorities to treat his medical needs; if

the authorities fail to do so, those needs will not be met." *Estelle*, 429 U.S. at 103.

To establish an Eighth Amendment medical claim, a plaintiff must show that "(1)

he had a serious medical need, (2) the defendants were deliberately indifferent to

that need; and (3) the deliberate indifference caused harm to the plaintiff." *Durham

v. Kelley*, 82 F.4th 217, 229 (3d Cir. 2023).

A medical need is serious if it "has been diagnosed by a physician as

requiring treatment" or if it "is so obvious that a lay person would easily recognize

the necessity for a doctor's attention." *Monmouth Cnty. Corr. Institutional Inmates

v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (quoting *Pace v. Fauver*, 479 F.

Supp. 456, 458 (D.N.J. 1979), *aff'd,* 649 F.2d 860 (3d Cir. 1981) (table)).

Additionally, "if 'unnecessary and wanton infliction of pain' results as a

consequence of denial or delay in the provision of adequate medical care, the

medical need is of the serious nature contemplated by the eighth amendment." *Id.*

(quoting *Estelle,* 429 U.S. at 103).  Further, "where denial or delay causes an

inmate to suffer a life-long handicap or permanent loss, the medical need is

considered serious." *Id.*

Deliberate indifference under the Eighth Amendment is a subjective standard. *Farmer v. Brennan*, 511 U.S. 825, 840 (1994).  "To act with deliberate indifference to serious medical needs is to recklessly disregard a substantial risk of serious harm." *Giles v. Kearney,* 571 F.3d 318, 330 (3d Cir. 2009).  To act with deliberate indifference, the prison official must have known of the substantial risk of serious harm and must have disregarded that risk by failing to take reasonable measures to abate it. *Farmer,* 511 U.S. at 837.  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

The mere misdiagnosis of a condition or medical need, or negligent treatment provided for a condition, is not actionable as a constitutional claim because medical malpractice is not a constitutional violation. *See id,* at 835 (holding that "deliberate indifference describes a state of mind more blameworthy than negligence")*; Spruill v. Gillis,* 372 F.3d 218, 235 (3d Cir. 2004) ("Allegations of medical malpractice are not sufficient to establish a Constitutional violation."); *Singletary v. Pa. Dep't of Corr.,* 266 F.3d 186, 192 n. 2 (3d Cir. 2002) (claims of medical malpractice, absent evidence of a culpable state of mind, do not constitute deliberate indifference under the Eighth Amendment).  Instead, deliberate indifference represents a higher standard, one that requires "obduracy and wantonness, which has been likened to conduct that includes recklessness or a

27

conscious disregard of a serious risk." *Rouse v. Plantier,* 182 F.3d 192, 197 (3d

Cir. 1999) (quoting *Whitley v. Albers,* 475 U.S. 312, 319 (1986)).

"Indeed, prison authorities are accorded considerable latitude in the

diagnosis and treatment of prisoners." *Durmer v. O'Carroll,* 991 F.2d 64, 67 (3d

Cir. 1993) (citations omitted).  And courts will "disavow any attempt to second

guess the propriety or adequacy of a particular course of treatment . . . [which]

remains a question of sound professional judgment." *Palakovic*, 854 F.3d at 228

(quoting *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir.

1979)).  "Mere disagreement as to the proper medical treatment does not support

an Eighth Amendment claim." *Caldwell v. Luzerne Cnty. Corr. Facility Mgmt.

Employees*, 732 F. Supp. 2d 458, 472 (M.D. Pa. 2010).

Thus,"[w]here a prisoner has received some amount of medical treatment, it

is difficult to establish deliberate indifference, because prison officials are afforded

considerable latitude in the diagnosis and treatment of prisoners." *Palakovic*, 854

F.3d at 227.  "Nonetheless, there are circumstances in which some care is provided

yet it is insufficient to satisfy constitutional requirements." *Id.*

The Third Circuit has found deliberate indifference where a prison official:

"(1) knows of a prisoner's need for medical treatment but intentionally refuses to

provide it; (2) delays necessary medical treatment based on a non-medical reason;

or (3) prevents a prisoner from receiving needed or recommended medical

treatment." *Rouse,* 182 F.3d at 197. The Third Circuit has also held that "[n]eedless suffering resulting from the denial of simple medical care, which does not serve any penological purpose, . . . violates the Eighth Amendment." *Atkinson v. Taylor,* 316 F.3d 257, 266 (3d Cir. 2003). "For instance, prison officials may not, with deliberate indifference to the serious medical needs of the inmate, opt for 'an easier and less efficacious treatment' of the inmate's condition." *Palakovic*, 854 F.3d at 228 (quoting *West v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978). "Nor may 'prison authorities deny reasonable requests for medical treatment . . . [when] such denial exposes the inmate to undue suffering or the threat of tangible residual injury.'" *Id*. (quoting *Monmouth Cty. Corr. Inst.*, 834 F.2d at 346). Thus, "[a] 'failure to provide adequate care . . . [that] was deliberate, and motivated by non-medical factors' is actionable under the Eighth Amendment, but 'inadequate care [that] was a result of an error in medical judgment' is not." *Parkell v. Danberg*, 833 F.3d 313, 337 (3d Cir. 2016) (quoting *Durmer,* 991 F.2d at 69).

"[T]here is a critical distinction 'between cases where the complaint alleges a complete denial of medical care and those alleging inadequate medical treatment.'" *Pearson*, 850 F.3d at 535 (quoting *United States ex. rel. Walker v. Fayette Cty*., 599 F.2d 573, 575 n.2 (3d Cir. 1979)). "Because 'mere disagreement as to the proper medical treatment' does not 'support a claim of an eighth amendment violation,' when medical care is provided, we presume that the

treatment of a prisoner is proper absent evidence that it violates professional standards of care." *Id.* (quoting *Monmouth Cty. Corr. Inst.*, 834 F.2d at 346).  And "there are two very distinct subcomponents to the deliberate indifference prong of an adequacy of care claim." *Id.* at 536.  "The first is the adequacy of the medical care—an objective inquiry where expert testimony could be helpful to the jury." *Id.*  "The second is the individual defendant's state of mind—a subjective inquiry that can be proven circumstantially without expert testimony." *Id.*  But a claim that medical care was delayed or denied completely "must be approached differently than an adequacy of care claim." *Id.* at 537.  "Unlike the deliberate indifference prong of an adequacy of care claim (which involves both an objective and subjective inquiry), the deliberate indifference prong of a delay or denial of medical treatment claim involves only one subjective inquiry—since there is no presumption that the defendant acted properly, it lacks the objective, propriety of medical treatment, prong of an adequacy of care claim." *Id.*  "All that is needed is for the surrounding circumstances to be sufficient to permit a reasonable jury to find that the delay or denial was motivated by non-medical factors." *Id.*

### iii.  The complaint fails to state claim against defendant Medford, but it states claims against defendants Vangorder, Rupert, Quigley, and Napoleon.

The Individual County Defendants contend that the complaint fails to state a claim against them upon which relief can be granted because Tressler has not

alleged facts from which it can plausibly be inferred that they were deliberately indifferent.[8]  In this regard, they contend that Tressler was being seen and treated by medical personnel,[9] the medical personnel were not deliberately indifferent, and they justifiably relied on the medical personnel.

A nonmedical prison official is not deliberately indifferent simply because he or she failed to respond to a prisoner's medical complaints when the prisoner was already being treated by a prison doctor. *Durmer*, 991 F.2d at 69.  "Absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." *Spruill*, 372 F.3d at 236;[10] *see also Pearson*, 850 F.3d at 540 n.4.

---

[8] Tressler asserts that the defendants claim that she did not have a serious medical need. *See doc. 17* at 16–17.  The defendants have not, however, argued that Tressler did not have a serious medical need.  Rather, their arguments are focused on the deliberate-indifference prong of a denial-of-medical-care claim.

[9] Although the Individual County Defendants contend that Tressler was receiving medical treatment and care everyday of her incarceration, *see doc. 14* at 15, that is simply not what Tressler alleges.  Rather, as set forth above, she alleges that there were some days when she was denied all medical care.

[10] In their reply brief, the Individual County Defendants suggest that *Thomas* changed the analysis in *Spruill*. *See doc. 18* at 8–9 (referring to the "Thomas exclusion").  As discussed above in connection with the failure-to-protect claims, in *Thomas*, the United States Court of Appeals held that there is no clearly established right to intervention to prevent a violation of the right to medical care. *Thomas*, 88 F.4th at 285.  But while the Third Circuit held that the officers in that case were entitled to qualified immunity as to the failure-to-protect claims, it also

("[T]he same division of labor concerns that underlie that rule apply when a nurse knows that a prisoner is under a physician's care and has no reason to believe that the doctor is mistreating the prisoner." "Given that it is the physician with the ultimate authority to diagnose and prescribe treatment for the prisoner, a nurse who knows that the prisoner is under a physician's care is certainly 'justified in believing that the prisoner is in capable hands,' *id.* so long as the nurse has no discernable basis to question the physician's medical judgment." *Id.* (quoting *Spruill*, 372 F.3d at 236).

As to Officer Medford, all Tressler alleges is that on April 2, 2022, Officer Medford and a medical provider appeared at Tressler's cell, Tressler complained of flank pain, the medical provider and Officer Medford observed her urinate and checked her prescriptions, but Tressler was not provided any additional medical care. *Doc. 1* ¶ 20e. This is not sufficient to plausibly allege that Officer Medford knew that although Tressler she was seen by a medical provider, he knew or had

---

held that those same officers were not entitled to qualified immunity at the denial-of-medical-care claims in that case. *Id.* at 285–86. It also noted that "on the facts here, a claim for failure to intervene would be almost identical to the underlying claim of failure to render medical care: It would have been virtually impossible for any of the Officers to have had knowledge of an ongoing violation of a right to medical care without themselves participating in that violation." *Id.* at 285 n.55. We do not read *Thomas*'s holding that a failure-to-protect claim is not clearly established in the medical context as changing the standards, including *Spruill*, for a denial-of-medical-care claim.

reason to believe that the medical provider was not treating her. Accordingly, Tressler has not plausibly alleged that Officer Medford was deliberately indifferent to Tressler's serious medical needs.

We reach a different conclusion, however, as to Officers Vangorder, Rupert, and Quigley. As to these officers, Tressler allege that on April 10, 2022, a medical provider and Corrections Officers Vangorder and Rupert came to her cell, and Tressler, who was lying face down on her bed and was unable to ambulate, told them that she could not feel her legs. *Doc. 1* ¶ 20q. The only care provided was that the medical provider offered Tressler a "muscle rub" and increased the dosage of Tylenol. *Id*. Later that same day, another medical provider and Officer Vangorder entered Tressler's cell, where they found her unconscious and used smelling salts to revive her. *Id*. ¶ 20r. They provided limited to no medical care. *Id*. On April 14, 2022, a medical provider and Corrections Officer Quigley entered Tressler's cell, where Tressler was lying naked and was mumbling incoherently. *Id*. ¶ 20v. Although Tressler begged to go to the hospital, the medical provider told her that she needed to ambulate and that she would feel better. *Id*. She was not given any medical care. *Id*. Tressler also avers that one particular medical provider and Corrections Officer Quigley chided her and refused to help her in any way. *Id*. ¶ 29. A reasonable inference from these alleged facts is that Officers Vangorder, Rupert, and Quigley relied on the medical providers' medical judgment in not

providing care to Tressler.  But that is not the only reasonable inference that can be drawn from the facts alleged.  Rather, given Tressler's allegations that she could not ambulate, but the medical providers did not provide anything more than cursory care to her, she has plausibly alleged facts from which it could be inferred that the Officers knew or had reason to know that she was not receiving appropriate medical care.  Thus, at this early stage of the proceedings, we will not dismiss the denial-of-medical-care claims against Officers Vangorder, Rupert, and Quigley.

Similarly, although it is close question, Tressler has plausibly alleged facts from which it could be inferred that defendant Napoleon knew that she was not receiving appropriate care.  Tressler alleges that defendant Napoleon, who was her counselor, was aware that she needed medical care, and he knew that PrimeCare short-staffed the area where she was housed. *Doc. 1* ¶ 30.  But he did not object to the lack of care that she was receiving from the corrections officer defendants and medical providers, and he did nothing to get her appropriate care. *Id*.  Given these allegations, at this early stage of the proceedings, we will not dismiss the denial-of-medical-care claim against defendant Napoleon.

### b. Qualified Immunity.

The Individual County Defendants also contend that they are entitled to qualified immunity.  We have already determined that the complaint fails to state a denial-of-medical-care claim upon which relief can be granted as to Officer Medford, and we will dismiss that claim against him on that basis.  Thus, we need not address qualified immunity as to Officer Medford.  Rather, we address qualified immunity only as to defendants Vangorder, Rupert, Quigley, and Napoleon.  For the reasons explained below, we conclude that these defendants are not entitled to qualified immunity from the denial-of-medical-care claims at this stage of the proceedings.

As set forth more fully above, "[t]he qualified immunity inquiry contains two prongs: (1) whether the facts alleged by the plaintiff show the violation of a constitutional right, and (2) whether the law was clearly established at the time of the violation." *Jefferson v. Lias*, 21 F.4th 74, 80 (3d Cir. 2021).  Defendants Vangorder, Rupert, Quigley, and Napoleon focus their arguments on the first prong.

Defendants Vangorder, Rupert, Quigley, and Napoleon contend that they are entitled to qualified immunity because the facts alleged by Tressler fail to establish the possibility of a constitutional violation by them.  In this regard, they assert that their actions were discretionary, that  Tressler's allegations suggest—at most—that

35

they were negligent or mistaken for relying on medical staff, and Tressler has not alleged facts to establish that they were on notice that the medical care that she was receiving was not proper. But as discussed above, we have already concluded that the complaint sufficiently pleads facts from which it can reasonably be inferred that they were deliberately indifferent to Tressler's serious medical needs. Thus, at this stage of the proceedings, defendants Vangorder, Rupert, Quigley, and Napoleon are not entitled to qualified immunity under the first prong of the qualified-immunity analysis.

Defendants Vangorder, Rupert, Quigley, and Napoleon do not specifically address the second prong of the qualified-immunity analysis, i.e., whether the right to medical care was clearly established. But we note the following. "For more than forty years under *Estelle*, it has been clear that a prison official violates the constitutional rights of an inmate by showing deliberate indifference to the inmate's existing serious medical need." *Adami v. Cnty. of Bucks*, No. CV 19-2187, 2022 WL 1073072, at *6–7 (E.D. Pa. Apr. 8, 2022). And the Third Circuit has long applied that standard to pretrial detainees. *See e.g. Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003). "Put simply, a detainee's right to adequate medical care is clearly established." *Rossman v. PrimeCare Med. Inc.*, No. 4:21-CV-00703, 2022 WL 1019991, at *5 (M.D. Pa. Apr. 5, 2022).

### B. Centre County.

Centre County contends that the claims against it should be dismissed. For the reasons discussed below, we disagree, and we conclude that Tressler has stated a claim upon which relief can be granted against Centre County.

A municipality, such as Centre County, cannot be held liable under 42 U.S.C. § 1983 for the unconstitutional acts of its employees on a theory of *respondeat superior*. *Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978). Rather, "under § 1983, local governments are responsible only for 'their *own* illegal acts.'" *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) (emphasis in original)). "[A] § 1983 claim against a municipality may proceed in two ways." *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019). One way for a plaintiff to present a claim against a municipality is to allege "that an unconstitutional policy or custom of the municipality led to his or her injuries." *Id.* Another way for a plaintiff to present a claim against a municipality is to allege that his injuries "were caused by a failure or inadequacy by the municipality that 'reflects a deliberate or conscious choice.'" *Id.* (quoting *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019)).

To plead a claim against a municipality under the policy-or-custom strand of municipal liability, "a plaintiff must allege that 'a [local] government's policy or

custom . . . inflict[ed] the injury' in question." *Estate of Roman*, 914 F.3d at 798

(quoting *Monell*, 436 U.S. at 694).  "'Policy is made when a decisionmaker

possess[ing] final authority to establish municipal policy with respect to the action

issues an official proclamation, policy, or edict.'" *Id*. (quoting *Andrews v. City of*

*Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990) (alteration in original) (internal

quotation marks omitted)).  "'Custom, on the other hand, can be proven by

showing that a given course of conduct, although not specifically endorsed or

authorized by law, is so well-settled and permanent as virtually to constitute law.'"

*Id*. (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)).

"To satisfy the pleading standard, [a plaintiff] must identify a custom or

policy, and specify what exactly that custom or policy was." *McTernan v. City of*

*York,* 564 F.3d 636, 658 (3d Cir. 2009).  "Although a policy or custom is necessary

to plead a municipal claim, it is not sufficient to survive a motion to dismiss."

*Estate of Roman*, 914 F.3d at 798.  "A plaintiff must also allege that the policy or

custom was the 'proximate cause' of his injuries." *Id*.

Another way for a plaintiff to present a claim against a municipality is to

allege that his or her injuries "were caused by a failure or inadequacy by the

municipality that 'reflects a deliberate or conscious choice.'" *Forrest*, 930 F.3d at

105 (quoting *Estate of Roman*, 914 F.3d at 798).  "The latter avenue arose in the

failure-to-train context, but applies to other failures and inadequacies by

municipalities, including those related to supervision and discipline of its . . .
officers." *Id.*

A plaintiff asserting a municipal liability claim based on a failure or
inadequacy of training, supervision, or discipline "need not allege an
unconstitutional policy." *Estate of Roman*, 914 F.3d at 798.  Rather, she must show
that the municipality's failure to train, supervise, or discipline "its employees
'reflects a deliberate or conscious choice.'" *Id.* (quoting *Brown v. Muhlenberg
Twp.*, 269 F.3d 205, 215 (3d Cir. 2001)).  In this regard, the plaintiff must show "a
failure or inadequacy amounting to deliberate indifference on the part of the
municipality." *Forrest*, 930 F.3d at 106.  "This consists of a showing as to whether
(1) municipal policymakers know that employees will confront a particular
situation, (2) the situation involves a difficult choice or a history of employees
mishandling, and (3) the wrong choice by an employee will frequently cause
deprivation of constitutional rights." *Id.*  In addition to deliberate indifference, a
plaintiff asserting a municipal liability claim based on a failure or inadequacy of
training, supervision, or discipline must also allege causation. *Elliott v.
Pennsylvania Interscholastic Athletic Assoc.*, No. 3:19-CV-01934, 2022 WL
987887, at *5 (M.D. Pa. Mar. 31, 2022).  "[T]he causation inquiry focuses on
whether 'the injury [could] have been avoided had the employee been trained
under a program that was not deficient in the identified respect." *Thomas v.*

*Cumberland Cty.*, 749 F.3d 217, 226 (3d Cir. 2014) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989)).

Tressler alleges that Centre County and PrimeCare promulgated and maintained policies and customs that caused her rights to be violated. *Doc. 1* ¶ 68. According to Tressler, Centre County and PrimeCare failed to adhere to protocol in detecting and safeguarding inmates who made medical complaints. *Id*. ¶ 69. More specifically, she alleges that Centre County and PrimeCare maintained a policy of not staffing the mental-health ward with proper doctors and medical staff to treat the non-psychiatric medical needs of inmates. *Id*. ¶ 70. And they had a policy of allowing staff to conduct rounds from the front of the cell without entering the cell to properly examine and evaluate inmates. *Id*. ¶ 71. They also maintained a policy of not having a medical provider to properly evaluate inmates complaining of pain. *Id*. ¶ 72. Further, they maintained a policy of not properly ensuring that referrals for radiographic film studies were speedy, and they failed to follow up on such referrals. *Id*. ¶ 73. And there was a custom among behavioral-health providers to not properly investigate the cause of inmate complaints or the condition of inmates in the mental-health ward and to treat inmates complaining of physical ailments as somatic or psychosomatic. *Id*. ¶ 74.

According to Tressler, these policies and practices were implemented before, during, and after her detention at the CCCF *Id*. ¶ 75. And Tressler alleges that

Centre County and PrimeCare knew of the danger posed by these polices and customs. *Id*. ¶ 76. More specifically, they were aware prior to Tressler's incarceration at the CCCF of the serious and extreme danger posed by not properly providing medical care to inmates in the mental health ward, but they took no steps to enact proper policies. *Id*. ¶¶ 77, 78. And if they had enacted appropriate protocols or adequately trained and/or supervised the individual defendants, Tressler would have received appropriate care and supervision. *Id*. ¶ 79. According to Tressler, Centre County and PrimeCare were deliberately indifferent to her constitutional rights, their polices and customs were a direct and proximate cause of her injuries and damages, and she suffered immense physical pain, humiliation, fear, and physical injures as a result of their policies and customs. *Id*. ¶¶ 80, 81, 82.

Tressler also alleges that during all relevant times, defendants Irwin and Schell were supervisors at CCCF, and they were personally involved in and directly responsible for decision-making, practice, procedures, policy, training, and customs at the CCCF. *Id*. ¶ 5. She also alleges that defendant John Doe Medical Director was at all relevant times, a policy maker with respect to customs, practices, policies, and procedures at the CCCF, and he as was personally involved in Tressler's medical treatment. *Id*. ¶ 6. According to Tressler, Irwin, Schell, and John Doe Medical Director were deliberately indifferent to the needs of inmates at

the CCCF, including her. *Id.* ¶¶ 54, 60.  They were aware that certain policies and

customs posed a grave danger to inmates, including Tressler. *Id.* ¶ 55.  Further,

they maintained a policy of staffing the CCCF with inadequate medical providers,

and they did not properly refer Tressler to the proper physician to treat her

complaints of pain. *Id.* ¶¶ 56, 57.

In its brief in support, Centre County makes only a cursory argument that the

complaint fails to state a claim upon which relief can be granted against it.  After

setting forth some standards applicable to *Monell* claims, Centre County argues:

> Tressler must state with specificity the subject policy or
> custom and then explain how that policy or custom **caused** the
> alleged constitutional violation.  There is no single standalone
> or separate Centre policy or custom identified that **directly** or
> **caused** an injury to Tressler.  As such, there cannot be any
> "direct causal link" by Centre's policy/custom and Tressler's
> harm.  The medical treatment was being handled by professions
> [sic], specifically the PrimeCare employees on a daily basis.
> The non-medical employees of Centre as well as any policies
> regarding medical, were not the "moving force" behind any
> civil rights violation.
> In sum, Tressler has not and cannot validly set forth a
> <u>Monell</u> claim under the facts and circumstances of her
> Complaint.  Thus, the Centre County should be dismissed with
> prejudice and no further opportunities be given to her to amend.

*Doc. 14* at 19 (emphasis in original).  Similarly, in it reply brief, Centre County

argues:

> Tressler must state with specificity the subject policy or
> custom and then explain how that policy or custom **caused** the
> alleged constitutional violation. The medical treatment was
> being addressed by medical professionals, specifically the

> PrimeCare employees. Based upon Tressler's own facts, she
> was seen on a daily basis. The non-medical employees of
> Centre as well as any policies regarding medical care, were not
> the "moving force" behind any civil rights violation.

*Doc. 18* at 10 (emphasis in original).

To the extent that Centre County is suggesting that Tressler failed to identify the policies or customs that allegedly violated her rights, we disagree. As we set forth above, Tressler has set for the policies and customs at issue.

We also reject Centre County's contention that Tressler has not plausibly alleged that the policies and customs at issue caused a violation of her rights. Tressler alleges that Centre County and PrimeCare promulgated and maintained policies and customs that caused her rights to be violated. *Doc. 1* ¶ 68. And, she alleges, if they had enacted appropriate protocols or adequately trained and/or supervised the individual defendants, she would have received appropriate care and supervision. *Id*. ¶ 79. According to Tressler, Centre County and PrimeCare were deliberately indifferent to her constitutional rights, their polices and customs were a direct and proximate cause of her injuries and damages, and she suffered immense physical pain, humiliation, fear, and physical injures as a result of their policies and customs. *Id*. ¶¶ 80, 81, 82. Construing these allegations and Tressler's other factual allegations regarding the care that she received in the light most favorable to her, as we must when deciding a motion to dismiss, Tressler has

plausibly alleged the Centre County's policies and customs caused a violation of her right to medical care.

Centre County may also be suggesting that because it contracted with PrimeCare to provide medical care, it cannot be liable. If that is what it is suggesting, it is wrong.

Centre County had a constitutional obligation to provide medical care to its prisoners and detainees. *Ponzini v. Monroe Cnty.*, No. 3:11-CV-00413, 2015 WL 5123720, at *10 (M.D. Pa. Aug. 31, 2015) (Mariani, J.). The fact that it contracted with PrimeCare to provide that medical care does not absolve the County of its duty. *Id*. at 11. Rather, despite the contract, "'the county itself remains liable for any constitutional deprivations caused by the policies or customs of'" its contract-medical provider. *Id*. (quoting *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705 (11th Cir. 1985)). "'In that sense, the county's duty is non-delegable.'" *Id*. (quoting *Ancata*, 769 F.2d at 705).

Thus, Centre County "has potential liability stemming from its own, independent obligation to police its medical services contract with PrimeCare Medical, Inc." *Id*. (denying summary judgment to Monroe County based on its potential liability stemming from its obligation to police its contract for medical care with PrimeCare Medical, Inc.); *see also Ravert v. Monroe Cnty.*, No. 4:20-CV-0889, 2021 WL 1017372, at *7 (M.D. Pa. Mar. 17, 2021) (Arbuckle, M.J.)

(analogizing that case to *Ponzini* and denying motion to dismiss filed by Monroe County given that the plaintiff had alleged a *Monell* claim against PrimeCare Medical, Inc.); *Whitehurst v. Lackawanna Cnty.*, No. CV 3:17-903, 2020 WL 6083409, at *4 (M.D. Pa. Oct. 15, 2020) (Mannion, J.) (agreeing with the reasoning of *Ponzini* and denying summary judgment to the County given that there were questions of fact about the County's vigilance in supervising its contract with the contract medical provider). And "[w]hile the Court recognizes that 'prison officials cannot be required to second guess the medical judgment of the [staff] physician,' [the County's] contractual position vis-à-vis PrimeCare Medical, Inc. is an altogether different type of relationship than that between an on-the-ground medical provider and a correctional officer working" at the prison. *Ponzini*, 2015 WL 5123720, at *11 (quoting *Ellison v. Scheipe*, 570 F. Supp. 1361, 1363 (E.D. Pa. 1983)). The County's "potential liability arises from its policy of contracting away of a nondelegable duty coupled with its [alleged] failure to ensure that the contract was properly carried out and the nondelegable duty met." *Id.* at * 11 n.15.

Based on the foregoing, to the extent that Centre County is suggesting that it cannot be liable because PrimeCare was providing contract medical care to its prisoners and detainees, we reject that suggestion.

In sum, the complaint states a denial-of-medical-care claim upon which relief can be granted against Centre County.

## V.  Leave to Amend.

"[I]f a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." *Phillips v. County of Allegheny,* 515 F.3d 224, 245 (3d Cir. 2008).  In a civil-rights action, the court "must provide the plaintiff with this opportunity even if the plaintiff does not seek leave to amend." *Id.*

It would be futile to allow Tressler to amend her complaint as to the failure-to-protect claims against the Individual County Defendants given that they are entitled to qualified immunity.  But given the liberal-amendment standard, and in an abundance of caution, we will provide Tressler an opportunity to amend her complaint to attempt to state a denial-of-medical-care claim upon which relief can be granted against defendant Medford.

## VI.  Conclusion.

For the reasons set forth above, the County defendants' motion to dismiss will be granted in part and denied in part.  The motion will be granted to the extent that all claims against defendants CCCF, Irwin, and Schell will be dismissed.  The

motion will also be granted to the extent that the failure-to-protect claims against defendants Medford, Vangorder, Rupert, Quigley, and Napoleon will be dismissed, and the denial-of-medical-care claim against defendant Medford will be dismissed. The motion will further be granted to the extent that the Tressler's demand for a specific monetary amount will be stricken. The motion will otherwise be denied. We will grant Tressler leave to amend as set forth above. An appropriate order follows.

_**S/Susan E. Schwab**_
Susan E. Schwab
United States Magistrate Judge